## 23382

SOUTH CAROLINA STATE BUDGET & CONTROL BOARD, DIVISION OF GENERAL SERVICES, INSURANCE RESERVE FUND, Appellant v. Atlee PRINCE, Tommy Dabbs, Naomi Sanders, and Sumter County School District Two, Respondents.

(403 S.E. (2d) 643)

Supreme Court

*Charles E. Carpenter, Jr., Deborah L. Harrison, George C. Beighley* of *Richardson, Plowden, Grier and Howser,* all of Columbia, *for appellant.*

*Kenneth L. Childs, David E. Dubberly* of *Childs, Duff, St. Pierre and Hardin, P.A.,* Columbia, *for Sumter County School Dist. Two, respondent.*

*Randall M. Chastain,* Columbia, *for Atlee Prince, respondent.*

*J. Edward Bell, III, Bobby R. Bagley* of *Bell and Bagley,* Sumter, *for Tommy Dabbs* and *Naomi Sanders, respondent.*

Heard Dec. 12, 1990.

Decided April 8, 1991.

HARWELL, Justice:

This declaratory judgment action was initiated by appellant South Carolina State Budget and Control Board, Division of General Services, Insurance Reserve Fund (Fund), against respondents Atlee Prince (Prince), Tommy Dabbs (Dabbs), and Naomi Sanders (Sanders), all members of Sumter County

School Board (School Board), and against Sumter County School District Two (School District). The School District held an insurance policy issued by the Fund which provided coverage to members of the School Board. The Fund sought a declaration of whether coverage existed under the insurance policy for a judgment against Prince for defamatory statements he made about Sanders and Dabbs. The Fund appeals from the trial judge's order which held that the jury award of actual and punitive damages was covered under the policy. We affirm.

## I. FACTS

Respondents Prince, Sanders, and Dabbs, were members of the School Board. Sanders was the Chairman of the School Board and the immediate past Vice-Chairman, Prince was Vice-Chairman and Chairman of the School Board's Finance Committee, and Dabbs was the immediate past Chairman. Prince was elected as a member of the School Board when Dabbs was Chairman. Prince wanted to be Chairman. Prince claims he agreed to nominate and support Sanders to succeed Dabbs as Chairman with the understanding that Prince would serve as Vice-Chairman, but would be elected Chairman at the next election. However, at the next election, Sanders opposed Prince and Sanders was re-elected.

Prince claims that his initial campaign for the School Board position arose out of his concerns about possible financial mismanagement in the School District. Due to his concerns, and his desire to investigate the allegations of financial impropriety, Prince established the School Board's Standing Committee on Finance. Prince was elected Chairman of the Committee. In this position, he attempted to investigate the financial structure of the School District. Prince claims that he discovered that the School District lacked a viable internal control system, thus making it impossible to track the thirty million dollars that flowed through the School District every year. This discovery led Prince to urge the School Board to hire an auditing firm to do a special audit. However, Prince claims that certain School Board members attempted to impede the special audit.

With his election as Chairman of the School Board blocked by Sanders and his efforts to obtain an audit thwarted, Prince

asserts that he believed that his only recourse was to inform the public of his concerns, in the hope that the public would put pressure on the School Board to investigate the financial status of the School District. Thus, on July 7, 1987, Prince held a news conference at the District Administration Office. Prince stated that the purpose of the news conference was to attract public attention to "an apparent pattern of malfeasance, fraud, mismanagement [of district funds], illegal bid-solicitation practices, kickbacks, and bribery" within the Dabbs/Sanders administration.

As a result of Prince's statements at the press conference, Sanders and Dabbs initiated separate actions against Prince, in both his individual and official capacities, for defamation, conspiracy, and republication of defamatory remarks. The actions were consolidated for trial. On the motion of Prince, the School District based on his determination that the School District could not be liable under the South Carolina Tort Claims Act, S.C. Code Ann. § 15-78-10 to 15-78-190 (Supp. 1989).

The trial judge submitted the case to the jury solely on the issues of whether the remarks were made with actual malice, and whether these remarks resulted in damage to Sanders' and Dabbs' reputations. The jury returned a verdict in favor of each plaintiff in the sum of $1,250,000.00 in actual damages and $750,000.00 in punitive damages. The trial judge denied Prince's post-trial motions for judgment notwithstanding the verdict and a new trial.[1]

Although the Fund defended Prince and the School District during the trial pursuant to the insurance policy it had issued to the School District, it did so under a reservation of rights. Accordingly, at the conclusion of the trial, the Fund brought this declaratory judgment action asserting that the policy does not provide coverage for the judgment against Prince because: (1) Prince was not an insured under the policy as he was acting outside the course of his volunteer employment with the School District; (2) Prince's defamation of Sanders and Dabbs was not an "occurrence" as defined in the policy since his conduct was intentional; (3) it would contravene pub-

---

[1] This verdict was reversed on the grounds that it was excessive in the companion case of *Sanders v. Prince*, Op. No. 23381, — S.C. —, —, 403 S.E. (2d) 640, — (S.C. Sup. Ct. filed April 8, 1991, 1991) (Davis Adv. Sh. No. 9 at p. 28).

lic policy to provide coverage for defamation; and (4) punitive damages are not recoverable under the policy. The Fund appeals the trial judge's finding that the policy provided coverage to Prince.

## II. DISCUSSION

### A. WAS PRINCE AN INSURED?

In defining "person insured," the Fund's policy provides that: "[a]ny volunteer employee of the entity designated in the declaration as 'named insured' is an insured, but only while the volunteer employee is acting in the course of his or her volunteer employment for the entity." It is undisputed that Prince was a volunteer employee. The dispositive issue is whether Prince was "acting in the course of his volunteer employment" when he made the defamatory accusations. The trial judge held that Prince was acting in the course of his volunteer employment and thus was an insured under the policy. We agree.

The Fund argues that we are constrained by the South Carolina Tort Claim Act (Act), including its definition of "scope of official duty," S.C. Code Ann. § 15-78-30(i) (Supp. 1989), in determining whether Prince was acting within the course of his employment. However, the Act does not provide immunity to employees whose conduct constitutes actual malice.[2] S.C. Code Ann. § 15-78-70(b) (Supp. 1989). Consequently, it is the language of the policy, and not of the Act, which is determinative. The policy does not limit coverage to acts within the "scope of official duty," but instead utilizes broader language and provides coverage to an employee "acting in the course . . . of employment."

Since the trial judge could not find any case law which interpreted this phrase in connection with an insurance policy, he relied on the interpretation of this phrase under general master/servant liability and workers' compensation principles. We find that this was reasonable in light of the principle that insurance contracts are generally construed against the party who prepares them and liberally in favor of

---

[2] Since Sanders and Dabbs are public officials, they have to prove that Prince acted with actual malice in order to recover against him. *New York Times v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. (2d) 686 (1964).

the insured. *McCracken v. Gov't Employees Ins. Co.*, 284 S.C. 66, 325 S.E. (2d) 62 (1985). In defining the phrase "in the course of employment" in a workers' compensation case, we stated that:

> an employee, to be entitled to compensation, need not be in the actual performance of the duties for which he was expressly employed in order for his injury or death to be in the 'course of employment' and thus compensable. It is sufficient if the employee is engaged in a pursuit of undertaking consistent with his contract of hire and which in some logical manner pertains to or is incidental to his employment.

*Beam v. State Workmen's Compensation Fund*, 261 S.C. 327, 332, 200 S.E. (2d) 83, 86 (1973).

In *Crittenden v. Thompson-Walker Co., Inc.*, 288 S.C. 112, 341 S.E. (2d) 385 (Ct. App. 1986), the Court of Appeals discussed scope of employment in the master-servant context. In *Crittenden*, an employee of Thompson-Walker physically assaulted the plaintiff because he refused to pay a bill for work performed by Thompson-Walker. The dispositive issue was whether the employee was acting outside the scope of his employment when he assaulted the plaintiff. In finding the employer liable, the Court of Appeals held:

> it is not necessary to find the particular act creating liability was within the servant's authority. Nor is it necessary that the assault should have been made as a means or for the purpose of performing the work the servant was employed to do. If the servant is doing some act in furtherance of the master's business, he will be regarded as acting within the scope of his employment, although he may exceed his authority. . . . If there is doubt as to whether the servant in injuring a third party was acting at the time within the scope of his employment, the doubt will be resolved against the master. . . .

288 S.C. at 115-116, 341 S.E. (2d) at 387 (citations omitted).

Applying these principles, we conclude that the facts of this case mandate the finding that Prince was acting in the course of his employment at the time of the defamation. Prince was an elected trustee of the governing

board of the School District and served as Chairman of the School Board's Finance Committee. Prince's statements at the press conference addressed his concerns about the fiscal management of the School District; these concerns specifically stemmed from his position on the School Board. As such, his actions pertained to his position and were in furtherance of the School District's business. Furthermore, in his affidavit, the Executive Director of the South Carolina School Boards Association stated that one of the School Board members "most important functions is to keep tabs on one another through the exchange of views and the exposure of those views to the public." In fact, the School Board's own policy specifies that it must "[p]resent the needs of the school before the citizens of the community." Finally, as the trial judge in the underlying action noted:

> The news release was issued on Sumter County School District No. 2 stationary; the news conference was held at the Sumter County School District No. 2 office building, and the Defendant specifically gave his statements as Vice-Chairman of Sumter County School District No. 2. He [Prince] also testified that he was acting individually and as Vice-Chairman of the School Board.

Although Prince was acting without the express authorization of the School Board, his activities were not wholly disconnected from the business of the School District such that he was acting outside the scope of his employment. The trial judge correctly concluded that it is a reasonable construction of the insurance policy to find that Prince was acting within the "course of his employment" and, accordingly, was an "insured" as provided by the terms of the policy.

## B. WAS THERE AN OCCURRENCE?

The policy only provides for damages because of personal injury "caused by an occurrence." The policy defines an "occurrence" as "an accident . . . which results in personal injury or property damage neither expected nor intended from the standpoint of the insured." The trial judge found that the Fund failed to prove that Prince either expected or intended to cause personal injury to Sanders and Dabbs. The Fund argues that the trial judge erred because a

jury has to find that Prince acted with actual malice in order to hold him liable, and that a finding of actual malice would prove that Prince acted intentionally or expected to cause the injuries to Sanders and Dabbs. We disagree.

The policy's definition of covered personal injuries specifically includes defamation. The policy also specifically covers other intentional torts: false arrest, false imprisonment, malicious prosecution, wrongful entry or eviction or other invasion of the right of private occupancy, and assault and battery not committed by or at the direction of the insured unless committed for the purpose of protecting persons or property. Thus, the policy purports to provide coverage for certain intentional torts under the policy's definition of covered personal injuries, yet it attempts to deny coverage for injuries expected or intended under the definition of an occurrence. This internal inconsistency in the policy renders it ambiguous and when a policy is "susceptible to more than one reasonable interpretation, one of which would provide coverage, this Court must hold as a matter of law in favor of coverage." *Gaskins v. Blue Cross-Blue Shield of S.C.*, 271 S.C. 101, 108, 245 S.E. (2d) 598, 602 (1978).

It would be unreasonable to interpret this policy to exclude coverage for defamation when the policy specifically includes defamation as a covered personal injury. This is especially true as the policy does not contain an intentional act exclusion, but rather, it definitively purports to cover certain intentional acts. In sum, we conclude that the defamation in this case is a "personal injury" caused by an "occurrence" as these terms are used in the policy.

## C. PUBLIC POLICY

The Fund argues that it contravenes public policy to provide coverage for "intentional and malicious defamation." However, the policy specifically states that it provides coverage for defamation and it does not exclude coverage for defamation committed with actual malice. The Fund should not be permitted to deny coverage in the name of public policy when the language of its own policy specifically provides such coverage.

## D. PUNITIVE DAMAGES

The Fund argues that its policy does not cover an ■ award of punitive damages. The policy provides that: "The Fund will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages." The policy does not define damages. The trial judge held that punitive damages were covered by the policy. We agree.

In *Carroway v. Johnson*, 245 S.C. 200, 139 S.E. (2d) 908 (1965), we held that an automobile liability policy, which utilized the identical language used in the Fund's policy, covered an award of punitive damages. In *Carroway*, we stated that:

> The policy under consideration did not limit recovery to actual or compensatory damages. The language of the policy here is sufficiently broad enough to cover liability for punitive damages as such damages are included in the 'sums' which the insured is legally obligated to pay as damages because of bodily injury within the meaning of the policy.

*Id.* 245 S.C. at 205, 139 S.E. (2d) at 910. Here, as in *Carroway*, the policy does not limit recovery to actual damages. Instead, the policy uses broader language which, under the rules of construction and interpretation of insurance policies, must be read as encompassing punitive damages. The Fund is obligated, under the language of its policy, to provide coverage for any punitive damages awarded against Prince.

## E. CONCLUSION

We conclude that the Fund does have a duty to indemnify Prince. However, the Fund's liability is restricted to the amount of the policy limit, which is $500,000 per occurrence. In addition, the Fund has a duty to further defend Prince in the underlying action as Prince was granted a new trial.

Accordingly, the order of the trial judge is

Affirmed.

GREGORY, C.J., CHANDLER and TOAL, JJ., and BRUCE LITTLEJOHN, Acting Associate Justice, concur.